IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BESSIE M. HALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:05cv393-VPM |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Bessie M. Hall ["Hall"] filed this action seeking review of a final decision of the defendant ["Commissioner"] (Doc. # 1) pursuant to 42 U.S.C. §§ 405(g) (2000).  Upon review of the record and the briefs submitted by the parties, the court finds that the Commissioner's decision should be affirmed.

## I.    FACTS AND PROCEDURAL HISTORY

Hall filed for disability insurance benefits on 14 August 2002 at the age of 57 (R. 52-54).  In the reports she completed in support of her application, Hall claimed to have become unable to work as of 31 July 2002 because of the following conditions:

1.    a heart condition that required stent placement surgery and acid reflux

2    musculoskeletal problems, including degenerative disk disease in  the lumbar region of her spine

3.    carpal tunnel syndrome

(R. 70).  Hall completed the 11th grade, and her past relevant employment includes work as a retail sales cashier and school cafeteria worker (R. 82).

Her application was denied initially (R. 32-33), and a hearing before Administrative Law Judge ["ALJ"] James D. Smith resulted in an unfavorable decision (R. 14-29).  The Social Security Administration's ["SSA"] Appeals Council denied Hall's request to review the ALJ's decision (R. 4-12), and Hall filed this timely lawsuit (Doc. # 1).

## II.   STANDARD OF REVIEW

The district court's review of the Commissioner's decision is a limited one. Reviewing courts "may not decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).  The court must affirm the Commissioner's decision "if it is supported by substantial evidence and the correct legal standards were applied," *Kelley v. Apfel*, 185 F.3d 1211 (11th Cir. 1999) (citing *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997)).[1]  This is true despite the existence of substantial evidence "contrary to the findings of the ALJ." *Barron v. Sullivan*, 924 F.2d

---

[1]      In *Graham v. Apfel*, 129 F. 3d at 1422, the Court of Appeals stated that:

> Substantial evidence is described as more than a scintilla, and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

227, 230 (11th Cir. 1991).  "There is no presumption, however, that the Commissioner followed the appropriate legal standards in deciding a claim for benefits or that the legal conclusions reached were valid."  ***Miles***, 84 F.3d at 1400 (citations omitted).


## III.   DISCUSSION

### A.   *Standard for Determining Disability*

An individual who files an application for Social Security disability benefits must prove that she is disabled, which means that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A) (2000); *see also* 20 C.F.R. § 404.1512(a) (2000).

The regulations governing disability determinations provide a five-step sequential evaluation process that the ALJ must follow to determine whether a claimant has proven that she is disabled.  *See* 20 C.F.R. § 404.1520; *see also* ***Ambers v. Heckler***, 736 F.2d 1467, 1469 (11th Cir. 1984); ***Williams v. Barnhart***, 186 F. Supp. 2d 1192, 1195 (M.D. Ala. 2002).  If the claimant is not currently engaged in substantial gainful activity, the ALJ must determine whether she suffers from a severe impairment that has lasted or is expected to last 12 months or more. §§ 404.1509, 404.1520(a)(4)(i)-(ii).  If so, and the impairment(s) is of such severity as to meet or medically equal a condition described in the SSA's "Listing of Impairments," then the claimant will be found to be disabled.  § 404.1520(a)(4)(iii); 404, subpt. P, app. 1.

3

If the claimant's severe impairment(s) does not automatically qualify her for disability benefits, the ALJ must then assess her residual functional capacity ["RFC"], which represents "the most [a claimant] can still do despite [her] limitations." § 404.1545(a). Considering her RFC, the ALJ must determine whether the claimant is able to perform the physical and mental demands of her past relevant work. § 404.1520(a)(4)(iv). If not, the ALJ must determine whether, considering her RFC, age, education, and past work experience, the claimant is capable of performing other jobs available in significant numbers in the national economy. §§ 404.1520(a)(4)(v), 404.1560(c).

**B.** *Application of the Standard: The ALJ's Findings*

After discussing the relevant law and the evidence in the record, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since July 31, 2002.

3. The claimant has lumbar degenerative disc disease, a history of myocardial infarction with stent placement, carpal tunnel syndrome and depression, which are "severe" impairments under the Act.

4. The claimant's impairments, when considered individually and in combination, do not meet or medically equal one of the listed impairments in 20 CFR § 404, Subpart P, Appendix 1.

4

5.    The claimant's assertions relative to symptomatology, functional limitations and restrictions of activities of daily living have been considered in light of the factors set forth in 20 CFR § 404.1529 and SSR 96-7p, and are found to lack corroboration or substantiation in the medical evidence, and are not credible as to a disabling impairment.

6.    The claimant possesses the residual functional capacity to perform light semi-skilled work.

7.    The claimant's past relevant work as a retail sales clerk and cashier does not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

8.    It is the claimant's responsibility to provide medical evidence that supports her alleged disability. See Nathan L. Ellison v. Jo Anne B. Barnhart, supra.  The claimant has failed to meet this burden in this case.

9.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(e)).

(R. 28-29).

Thus, Hall's claims failed because the ALJ determined that she could return to her past previous work as a retail sales cashier.  *Id.*

Hall disagrees and contends that the ALJ's decision is not supported by substantial evidence in the record.  Specifically, Hall contends that the ALJ improperly discredited a conclusion offered by a consultative examiner that she could not perform work related activity on a regular basis due to her heart condition (Doc. # 10, pp. 6-12).  Hall further contends that the ALJ "did not adequately consider" her subjective complaints regarding her

Case 1:05-cv-00393-VPM   Document 13   Filed 05/05/06   Page 6 of 15


alleged carpal tunnel syndrome (Doc. # 10, pp. 12-15).

### C.    Hall's Heart Condition and Consultative Examination

In late December 2001, after suffering from recurrent chest and arm pain and dizzy spells for a couple of weeks, Hall was admitted to Southeast Alabama Medical Center, where James A. Hearn, M.D., ["Dr. Hearn"], noted the likelihood that Hall had suffered an "acute inferior myocardial infarction with a vasovagal episode" (R. 141).  Two days later, Hall underwent stent placement surgery.   Dr. Hearn described her condition as follows: "Essentially single vessel coronary artery disease with mild reduction in left ventricular systolic function in the post heart attack period treated with thrombolytic therapy is now successfully stented in the right coronary artery" (R. 143).

Upon discharging her from the hospital, Dr. Hearn noted that Hall "had excellent angiographic response" to the surgery (R. 138).  "She had mild LV dysfunction.  It is felt that her prognosis is excellent based on early thrombolytic therapy intracoronary stent placement."  *Id.*  He scheduled an exercise test to determine whether she could return to work.

The results of that test were "normal – no chest pain" (R. 152, 156).  Dr. Hearn noted that her "[b]lood pressure still increased somewhat[, e]specially with some low grade exertion" (R. 152).  Nevertheless, he directed Hall to "[i]ncrease activity one more week *before starting her job*."  *Id.* (emphasis added).

In February 2002, after returning to work, Hall visited the Southeast Cardiology Clinic

6

["Southeast"] complaining of arm pain, but Dr. Hearn did not attribute this to her heart condition, and he recommended conservative treatment, such as "[h]ot tub baths, Tylenol" (R. 150).

At a follow-up visit to Southeast on 9 April 2002, Hall complained of chest and arm pain as well as a constant feeling of tiredness (R. 147-48). "Darvocet seems to help her chest pain," Dr. Hearn noted, and he did not consider her heart condition to be the cause of either her arm pain or fatigue, attributing instead a possible "component of sleep apnea" or costochondritis, which is an inflammation of the junction between a rib and its cartilage. *Id.*; ***Webster's Medical Desk Dictionary*** 147 (1986). Dr. Hearn noted that she was still recovering from her previous heart attack. (R. 148).

Later in April, Hall's EKG stress test  was "[n]ormal . . . with the sole exception of a mild anteroapical hypokinesis that was present pre and post. . . . No new ischemia seen" (R. 154). Some chest pain was noted. *Id.*

In July 2002, at a follow-up visit to Southeast, Nelson S. Gwinn, III, M.D. [Dr. Gwinn"], noted Hall's "interim history" as follows:

> The patient presents today in followup. She has done relatively well from a cardiovascular standpoint. *Denies any specific complaints of arm discomfort or neck discomfort.* She is going to have an epidural and needs to stop her Plavix. She has had *no episodes of chest pain*. She has had some left arm pain and left leg pain. Intermittent back pain that are different from her episodes of angina. Recently she has been placed on Celexa in reference to her fatigue and no energy as well as increased anxiety. This seems to be helping minimally. She denies any other casrdiovascular symptoms.

(R. 145) (emphasis added).

Dr. Gwinn noted that her EKG and sinus rhythm were "[n]ormal" (R. 145).  He also noted "tennis elbow" and indicated his efforts to convince Hall to stop smoking  (R. 145-56).

Six months later, in January 2003, at Hall's last visit to Southeast for which records exist in the administrative record before the court, Dr. Gwinn again summarized her "interval history" as follows:

> The patient presents today in followup.  She has generally done well since last visit.  She has had a CT of the chest at Fort Rucker which was reportedly normal.  She has had *no specific complaints since her last visit.  She denies any palpitations.  No pedal edema.  No other cardiovascular symptoms.  Overall she has done fairly well*.  She has had some side effects from the Celexa and wants to switch to Lexapro.

(R. 144) (emphasis added).  Dr. Gwinn noted that her EKG and sinus rhythm were "normal," and he scheduled  Hall for an additional follow-up visit in six months.[2]

In November 2002, approximately two months before Dr. Gwinn's generally favorable and wholly optimistic report, Willis V. Crawford, M.D., ["Dr. Crawford"], a general practitioner, performed a consultative examination (R. 177-80).  After documenting

---

[2]Records from the Lyster Army Community Hospital dated "Apr 2003" include a handwritten notation by someone who signed illegibly, stating, "Referral to cardiology May 7 because of blockage to heart" (R. 369).  This is the only reference in the record that could be construed as an indication of additional heart problems; however, this notation could also be construed as referring to the original problem for which a referral for a follow-up visit to a cardiologist may have been necessary.  Considering that the administrative hearing occurred in October 2003 and the ALJ did not issue his opinion until March 2004, the lack of any other reference in the record to a second heart condition compels the court to conclude that the latter possibility is the correct one.

Hall's history and noting the results of his physical examination, every aspect of which he considered normal, Dr. Crawford opined, "This lady does have the usual work related abilities such as sitting, standing, walking, lifting, carrying and handling objects.  However, *she is unable to do these things on a regular basis because of her underlying cardiac disease*" (R. 180) (emphasis added).

To her ultimate detriment, with respect to the alleged limitations imposed by her heart condition, Hall relies exclusively on Dr. Crawford's ultimate opinion that she is unable to work to challenge the ALJ's conclusion that she is able.  (Doc. # 10, pp. 6-12).  As Hall states, "The plaintiff's assertion that she is incapable of sustaining competitive employment is based on a consultative evaluation report obtained by the [SSA] from Dr. . . . Crawford." *Id.* at 7.

The ALJ thoroughly discussed Dr. Crawford's conclusion and determined that it was supported neither by his own examination notes nor the other medical evidence in the record.

> [Dr. Crawford's conclusion] is not corroborated by Dr. Crawford's own exam, which was primarily normal, is not substantiated by the claimant's performance in her GXTs and stress echocardiogram and is not echoed by any treating physician or specialist.  Generally, the more consistent an opinion is with the record as a whole, the more weight the Social Security Administration will give that opinion (20 CFR § 404.1527 (d)(4)).  In addition, the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight the [SSA] will give that opinion (20 CFR § 404.1527 (d)(3)).  In addition, the [SSA] also generally gives more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist (20 CFR § 404.1527(d)(5)).

9

(R. 28).

When additional medical evidence is required for a better understanding of the claimant's alleged impairments, the Commissioner will order a consultative examination from a "qualified source."  20 C.F.R. §§ 404.1519a, 404.1519g.  The report from the consultative examination will be used to "resolve a conflict or ambiguity if one exists" or to supplement the medical record with additional evidence "such as clinical findings, laboratory tests, a diagnosis or prognosis necessary for [a] decision."  20 C.F.R. § 404.1519a(a)(2).

As the ALJ discussed in his opinion, the weight accorded to a medical opinion depends upon several factors, including the nature and duration of the relationship between the patient and the medical source, how strongly the opinion is supported by the source's own notes and the claimant's other medical records, and whether the source specializes in an area of medicine of particular relevance.  20 C.F.R. § 404.1527(d).  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled," and such an opinion regarding the ultimate determination of disability "will not [be given] any special significance."  20 C.F.R. § 404.1527(e).

In general, the opinion of a consultative examiner is not entitled to the same weight accorded a claimant's treating physician, but the "ALJ has the discretion to weigh objective medical evidence and may choose to reject the opinion of a treating physician while accepting the opinion of a consulting physician.  Of course, if he follows that course of action, he must show 'good cause' for his decision." *Gholston v. Barnhart*, 347 F. Supp. 2d 1108, 1114 (M.D. Ala. 2003).

It is not clear what weight an ALJ may be *required* to accord a consultative examiner's medical opinion when not overlapping or conflicting with an opinion from a treating physician, but the Eleventh Circuit Court of Appeals has stated quite clearly that the opinion of a one-time examiner is "not entitled to great weight." ***Crawford v. Comm'r of Soc. Sec.***, 363 F.3d 1155, 1159 (11th Cir. 2004) (citing ***McSwain v. Bowen***, 814 F.2d 617, 619 (11th Cir. 1987)); *see also **Kent v. Sullivan***, 788 F. Supp. 541, 544 (N.D. Ala. 1992) (stating that the "report of a consulting physician who examined claimant once does not constitute 'substantial evidence'"). In addition, a treating physician's opinion "may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory," ***Crawford v. Comm'r of Soc. Sec.***, 363 F.3d 1155, 1159 (11th Cir. 2004) (quoting ***Edwards v. Sullivan***, 937 F.2d 580, 583-84 (11th Cir. 1991)). Thus, it follows that the opinion of a consulting physician who examined the claimant once may be similarly if not more easily discounted. In any event, the circumstances of the instant case do not present a borderline question.

Dr. Crawford's conclusion that Hall cannot "sit[], stand[], [or] walk[]" on a regular basis is troubling for a number of reasons.

First, his conclusion is not supported by his own notes from the physical examination he performed, the results of which he documented as being normal (179-80). Specifically, with respect to her heart, Dr. Crawford noted, "The [Point of Maximum Impulse] is in the 5th intercostal space. It is not forceful. There is a normal rhythm. No murmurs are detected, no shocks noted. Heart sounds are as usual" (R. 179). When describing her present

11

condition, which appears to be based largely on Hall's subjective statements, Dr. Crawford noted that, since her heart surgery, "[s]he has done reasonably well . . . except for the tiredness" (R. 177).

To read Dr. Crawford's conclusion after digesting his examination report could lead a reasonable reviewer to conclude that Dr. Crawford assumes anyone who has had a myocardial infarction and stent placement is precluded from sitting, standing or walking on a regular basis and is thus disabled.  Yet, Dr. Crawford's report does not attempt to explain this implied professional opinion, and Dr. Crawford's status as a general practitioner, as opposed to a cardiologist, belies his enjoyment of the credentials or experience to make such a broadly sweeping determination.

Second, Dr. Crawford's conclusion is not supported by Hall's own statements.  Hall testified that her daily activities, which include taking her dogs outside, sitting while watching television, performing light housekeeping and transporting her grandchildren in her car, are limited due to pain "from my shoulders to my elbows, my hands and my back and my leg" (R. 426-34).   As Dr. Crawford himself noted, her chief complaints were "[d]epression; hip and leg problems; burning sensation in left hip and thigh; back; heart *attack*; headaches; leg give [sic] out; memory loss; nerves" (R. 177) (emphasis added).[3]

Although Hall testified that she takes medication "if [she has] a lot of pain in [her] chest," she did not state that she actually experienced any chest pain or tightness with activity

_____

[3]As the records discussed *infra* make clear, Hall's complaints of musculoskeletal pain were not related to her heart condition.

12

(R. 435).  Moreover, Hall admitted that she continued her job in the school cafeteria after her heart surgery in December 2001 through the end of the school year the following May (R. 425).

Finally, Dr. Crawford's conclusion is not supported by the other medical evidence in the record, discussed *infra*, much of which he apparently reviewed for his report.  The records related to Hall's heart condition and surgery indicate that her treating physicians considered her prognosis excellent and cleared her to return to work, which, as previously noted, she did.  Periodic complaints of chest pain tapered off within a few months after her surgery, and the results from subsequent diagnostic tests were normal.

Therefore,  the ALJ's decision not to accord any weight to Dr. Crawford's unexplained, conclusory opinion, which in effect amounted to an opinion on the ultimate issue of disability, was not the product of legal error and is strongly supported by substantial evidence in the record.


**D.      *Carpal Tunnel Syndrome***

Hall's contentions regarding her alleged carpal tunnel syndrome are wholly without merit because she has not been diagnosed with carpal tunnel syndrome by a medical source considered acceptable for the purpose establishing the existence of an impairment.  The relevant regulation provides as follows:

> (a) *Sources who can provide evidence to establish an impairment*.  We need evidence from acceptable medical sources to establish whether you have a medically determinable

13

impairment(s).

20 C.F.R. § 404.1513(a).

Pursuant to the regulations, acceptable medical sources include "licensed physicians", "licensed or certified psychologists", "licensed optometrists", "licensed podiatrists", and "qualified speech-language pathologists." *Id.* Hall's alleged carpal tunnel syndrome was noted by JoEllen S. Flory ["Flory"], a family nurse practitioner - not a medical source considered to be acceptable.[4]

Although the records contain other references to Hall's complaints of arm pain, no acceptable medical source offered a definitive diagnosis. Moreover, even among unacceptable medical sources, there appears to have been no consensus. Thomas Ruediger, a physical therapist who examined Hall around the same time as nurse Flory, assessed her condition as "lateral epicondylitis," an inflammatory condition commonly referred to as "tennis elbow." ***Webster's Medical Desk Dictionary*** 215 (1986); (R. 147, 399).

Therefore, the ALJ's finding that Hall suffered from carpal tunnel syndrome reflects an apparently erroneous interpretation of the governing regulations or perhaps his desire to, as he put it, give Hall "the full benefit of doubt" (R. 26). With no acceptable medical evidence supporting the existence of carpal tunnel syndrome or any other medically determinable condition that would corroborate Hall's complaints of pain in her hands, arms and wrists, the ALJ did not err when he determined that Hall's complaints were not worthy

---

[4]Dr. Hearn incorrectly noted a diagnosis of "[b]ilateral carpal tunnel, *Dr.* Flory" (R. 147) (emphasis added).

of belief.

## IV.   CONCLUSION

Therefore, it is hereby

ORDERED that the final decision of the Commissioner is AFFIRMED.

DONE this 4th day of May, 2006.

/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED STATES MAGISTRATE JUDGE